UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ABDUL KARIEM MUHAMMUD, : | CIVIL ACTION NO. 3:CV-12-0404 |
| Petitioner : | (Judge Nealon) |
| v. : | |
| FRANK STRADA, : | |
| LSCI-Allenwood Warden, : | |
| Respondent : | |

## MEMORANDUM

Abdul Kariem Muhammud, an inmate currently confined in the Elkton Federal Correctional Institution, Lisbon, Ohio, filed this pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner claims that his due process rights were violated during the course of a prison disciplinary hearing held on January 20, 2011, at the Federal Prison Camp, Lewisburg, Pennsylvania, where he was found guilty of the prohibited act of Engaging in a Group Demonstration, a violation of Disciplinary Code Section 212. Specifically, Petitioner claims that he is "factually and actually innocent of the accusation written in the incident report: therefore, the sanction of lost good time credit is unwarranted." (Doc. 1, petition). As such he "urges this Court to review the physical evidence submitted as exhibits which will clearly reflect that Petitioner's complaint is true and accurate." Id. For

relief, Petitioner seeks the expungement of the incident report and sanction, and restoration of his forfeited good conduct time. Id. The petition is ripe for disposition and, for the reasons that follow, will be denied.

**Background**

On November 20, 2010, Petitioner was served with Incident Report No. 2092293 charging him with Engaging in a Group Demonstration, a Code 212 violation. (Doc. 10-1 at 14, Incident Report). The incident report, which was written by Boyd E. Ross, Correctional Officer, reads as follows:

> On 11/19/2010, at 6:25 p.m., I/M Muhammud #60919-066 came to the Camp Control Center demanding in a hostile manner that the televisions be turned back on. This inmate had approached this Officer along with six other inmates causing a group demonstration to take place. (I immediately notified S.O.S. Keim to report to the Camp Control Center). I then ordered this inmate along with the other six inmates to leave immediately in which they refused. I then ordered all inmates involved to find a seat on the floor and to wait for the Lieutenant on duty to arrive.

Id. On November 23, 2010, Petitioner appeared before the Unit Discipline Committee ("UDC"). See id. (Committee Action). Based on the severity of the prohibited act, the UDC referred the charge to the Discipline Hearing Officer ("DHO"), recommending the maximum sanctions and a disciplinary transfer. Id. During the UDC hearing, staff member, Sam Hummel, informed Muhammad of his rights at the DHO hearing and provided him with a copy of the "Inmate Rights at

Discipline Hearing" form. Id. at 19 (Inmate Rights at Discipline Hearing).

Also on November 23, 2010, Muhammud was provided with a "Notice of Discipline Hearing before the (DHO)" form. Id. at 20. Muhammud requested to have a staff member represent him and to call witnesses. Id.

On January 20, 2011, Petitioner appeared for a hearing before DHO, Todd W. Cerney. Id. at 22-25 (DHO Report). During the DHO hearing, Petitioner was again read his rights, and he indicated that he understood them. Id. The DHO confirmed that Muhammud received a copy of the incident report, and that C. Foust, Petitioner's staff representative was present. Id.

Petitioner offered the following statement on his behalf:

"I was in the camp library since 5:00 pm. The Trulincs records will show that. I've been trying to get proof, but no one will send it to me. Keim saw me and asked me my name, I kept telling him MUHAMMUD, but he didn't believe me. I didn't have my I.D. on me. I got a 300 level incident report for refusing his order. The time on Keim's report for refusing a order was 6:30. It this happened at 6:30, how could I have been with Ross at 6:25?"

Id.

Petitioner raised no procedural issues and a written statement was provided for consideration. Id. Also, Muhammud requested inmate Green as a witness. Id. Because Green was housed in a different facility, the DHO continued the hearing, so that the DHO and staff representative could interview Green. Id. Upon

completion of the interview, the hearing was reconvened and the testimony of Green was verbally disclosed. Id. Green informed the DHO that he had entered the Administrative Building to use the bathroom. Id. When he came out, Muhammud was at the water fountain and they spoke for a brief period. Id. Green further noted that at this time, Officer Ross was speaking to a group of inmates about the t.v.'s being turned off and inmates running from Officer Keim earlier in the day. Id.

In addition to the Incident Report and Investigation, the documentary evidence which the DHO considered in making his determination included: (1) Memoranda dated November 19, and December 3, 2010, from J. Keim; (2) Memorandum dated December 3, 2010, from R. Boyd; and (3) Photocopy of Administrative Remedy Procedure for Inmates Form. The specific evidence taken from the relied upon documentary evidence was as follows:

> MUHAMMUD'S involvement in the incident, as noted in Section 11 of the Incident Report 2092293, as provided by Ross E. Boyd, Jr., Correctional Officer, was reviewed. Paraphrased, R. Boyd writes: On 11/19/10, at or about 6:25 PM, inmate MUHAMMUD # 69919-066 came to the camp control center demanding in a hostile manner that the televisions be turned back on. This inmate had approached this officer along with six other inmates causing a group demonstration to take place. I immediately notified Senior Officer Specialist Keim to report to the camp control center. I then ordered this inmate along with the other six inmates to leave immediately in which they refused. I then ordered all inmates involved to find a seat on the floor and to wait for the Lt. on duty to arrive.

A memorandum from J. Keim, dated December 3, 2010, stated on November 19, 2010, at approximately 6:25, Officer Ross called him to report to the Administration Building. Upon his arrival, Keim stated he observed a group of inmates that appeared to be "irate" over the televisions being turned off and demanding that they be turned back on. It was Keim's perception that MUHAMMUD appeared to be the spokesperson for the group and was doing most of the talking. In relation, MUHAMMUD refused to give Keim his name and number when ordered. As the entire situation was perceived as threatening, Keim contacted the control center to send staff down to the camp. Upon arrival, the inmates involved were removed from the camp. A memorandum from Boyd E. Ross, dated December 3, 2010, stated on December[1] 19, 2010, at approximately 6:25 PM, he was processing the photographer in to the camp visiting room. Ross noted that several inmates were standing waiting to speak to him. MUHAMMUD was part of this group. Upon his return from the visiting room, the inmates immediately began to demand that the televisions be turned back on. It was Ross' perception that MUHAMMUD was the spokesman for the group. He noted MUHAMMUD as repeatedly demanding that the televisions be turned back on and that he wanted to see the Lt. Further, all inmates involved were making the same demands. Due to many other inmates being in the area, Ross perceived a threat and contacted institution staff. Upon staff arrival, the inmates were searched and removed to the Special Housing Unit.

Upon questioning by the DHO, MUHAMMUD denied the charge. He elaborated upon his plea by stating "I was in the camp library since 5:00 PM. The Trulincs records will show that. I've been trying to get proof, but no one will send it to me. Keim saw me and asked me my name, I kept telling him MUHAMMUD, but he didn't believe me. I didn't have my I.D. on me. I got a 300 level

---

[1] Although the DHO references the date of the incident as December 19, 2010, this is apparently a typographical error, as the incident report clearly sets forth date of the incident as November 19, 2010.

> incident report for refusing his order. The time on Keim's report for refusing an order was 6:30. If this happened at 6:30, how could I have been with Ross at 6:25?" The DHO did not find MUHAMMAD's defensive posture compelling in showing the charged act not committed. Whether or not he was in the library using the computer was viewed as of no consequence. MUHAMMUD testified he was at the water fountain and his witness, Green, could confirm this information. Witness Green divulged he was with MUHAMMUD at the water fountain and the incident as described by Officer Ross was taking place (issue with inmates regarding televisions). MUHAMMUD's initial claim not to have been in that area (claimed library) was exposed. Further, MUHAMMUD's belief that his incident report he received from Officer Keim for refusing to provide his name showed that he was not involved with any group disturbance was found without merit. Given the chain of events as described by Ross and Keim, Keim's involvement with MUHAMMUD came in afterward. Thus, the 6:30 PM time frame opposed to the 6:25 PM for Ross' claimed behavior of MUHAMMUD. The DHO believed for MUHAMMUD to be part of this group of inmates making demand upon staff on the operation of the Lewisburg Camp of not leaving when instructed, supported the charged act.
>
> After consideration of evidence documented above, the DHO has drawn the conclusion the greater weight of the evidence, listed in paragraphs two through four above, supports the finding MUHAMMUD, Abdul, Register No. 60919-066, committed the prohibited act(s) of Engaging in a Group Demonstration, Code 212, on 11/19/10, at or about 6:25 PM, Admin Bldg Hallway/Control Center, LEC, Lewisburg, PA.

Id. The DHO sanctioned Petitioner to disallowance of twenty-seven (27) days good conduct time; thirty (30) days disciplinary segregation; six (6) months loss of commissary privileges, concluding on 7/19/11; and a disciplinary transfer. Id. The

DHO documented his reasons for the sanctions given as follows:

> MUHAMMUD's involvement in a group demonstration threatened the orderly running of the facility as well as the safety of both staff and inmates. Any negatively intended group action in a correctional setting promotes unrest and potential violence. In this case, MUHAMMUD made demands to have televisions turned on. Accordingly, disciplinary segregation, disallowed good conduct time and disciplinary transfer are sanctioned in an effort to punish MUHAMMUD for his behavior, while loss of commissary privileges will hopefully deter him from this potentially dangerous action in the future. Id.

Muhammud was advised of his appeal rights at the conclusion of the hearing. Id.

**Discussion**

Liberty interests protected by the Fifth Amendment may arise either from the Due Process Clause itself or from statutory law. Torres v. Fauver, 292 F.3d 141 (3d Cir. 2002). It is well-settled that "prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Nevertheless, the Supreme Court found that there can be a liberty interest at stake in disciplinary proceedings in which an inmate loses good conduct time. Id. As Petitioner's sanctions did include the loss of good conduct time, he has identified a liberty interest in this matter.

In Wolff, the Supreme Court set forth the following minimum procedural

due process rights to be afforded to a prisoner accused of misconduct in prison which may result in the loss of good time credit: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the disciplinary charges; (3) an opportunity to call witnesses and present documentary evidence in his defense when it is consistent with institutional safety and correctional goals; (4) assistance from an inmate representative if the charged inmate is illiterate or complex issues are involved; and (5) a written decision by the fact finder of the evidence relied upon and the rationale behind the disciplinary action. Wolff, 418 U.S. at 563-67. The Supreme Court has held that the standard of review with regard to the sufficiency of the evidence is whether there is "any evidence in the record that could support the conclusion reached by the disciplinary board." Superintendent v. Hill, 472 U.S. 445-46 (1985); see also Griffin v. Spratt, 969 F.2d 16, 19 (3d Cir. 1992). If there is "some evidence" to support the decision of the hearing examiner, the court must reject any evidentiary challenges by the plaintiff. Hill, 472 U.S. at 457.

Muhammud's disciplinary hearing was held in January 2010. The applicable Bureau of Prisons' inmate disciplinary procedures for this time frame are codified at 28 C.F.R. § 541, et seq., and entitled, Inmate Discipline and Special Housing Units. These procedures are intended to meet or exceed the due process

requirements prescribed by the Supreme Court. See Von Kahl v. Brennan, 855 F.Supp. 1413, 1418 (M.D. Pa. 1994). Pursuant to the 2010 regulations, staff shall prepare an Incident Report when there is reasonable belief that a violation of BOP regulations has been committed by an inmate and the staff considers informal resolution of the incident inappropriate or unsuccessful. 28 C.F.R. § 541.14. The incident is then referred to the UDC for an initial hearing pursuant to § 541.15. The UDC hearing is "ordinarily held within three work days from the time staff became aware of the inmate's involvement in the incident" and does not include the initial day staff learns of the incident, weekends or holidays. See 28 C.F.R. § 541.15(b). This period may be extended for good cause shown by either the inmate or staff. See 28 C.F.R. § 541.15 (k). If the UDC finds that a prisoner has committed a prohibited act, it may impose minor sanctions. If the alleged violation is serious and warrants consideration for more than minor sanctions, or involves a prohibited act listed in the greatest severity category, the UDC must refer the matter to a disciplinary hearing officer for a hearing. 28 C.F.R. § 541.15. "The DHO shall give the inmate a written copy of the decisions and disposition, ordinarily within 10 days of the DHO's decision." 28 C.F.R. § 541.17(g).

In the instant case it is clear that Muhammud was afforded all of the required procedural rights set forth in Wolff. He received timely notice of the

incident report. He was properly informed of his rights before the hearing, as well as given the opportunity to make his own statement, present documentary evidence, have a staff representative, and to present witnesses on his behalf.

To the extent that Petitioner argues that he was in the library during the incident, his witness stated that he and Muhammud were at the water fountain observing the incident, and his documentary evidence stated "at some time" after he left the library, he was approached by Officer Keim who demanded his name and then wrote him an incident report because he did not believe his response. In addition, although Muhammud states Officer Keim did not believe him when he identified himself, the documentation Muhammud attaches to his own petition shows that he admitted he would not tell Officer Keim his name and that he was guilty of the infraction of refusing a direct order. See (Doc. 1, petition at 17, Incident Report at ¶ 17).

Since Muhammud was afforded all of his procedural rights, the only remaining issue is whether there was sufficient evidence to support the decision by the DHO. To the extent Muhammud is alleging the incident report was falsified and there was not enough evidence to find he had committed the prohibited act, the decision of the DHO is entitled to considerable deference by a reviewing court and the decision should be upheld if there is "some evidence" to support the decision.

In <u>Superintendent, Mass. Corr. Inst. v. Hill</u>, 472 U.S. 445 (1985), the Supreme Court held that the "some evidence" standard applies in addressing a state prisoner's due process claim. <u>Id</u>. at 456-57; see <u>Thompson v. Owens</u>, 889 F.2d 500, 501- 02 (3d Cir. 1989).

The United States Court of Appeals for the Third Circuit observed that the standard found in 28 C.F.R. § 541.17(f) (1986) was more stringent than the "some evidence" standard. <u>Henderson v. Carlson</u>, 812 F.2d 874, 879 (3d Cir. 1987). The Court concluded that the "substantial evidence" standard in § 541.17(f) (1986) was "clearly higher than any standard that the Constitution imposes on prison disciplinary proceedings." <u>Id</u>. In 2007, § 541.17(f) was amended and no longer includes the "substantial evidence" standard. 28 C.F.R. § 541.17(f) (2007). Section 541.17(f) (2007) now requires that a DHO's decision be based on "some facts;" and, if there is conflicting evidence, the decision is based on "the greater weight of the evidence." <u>Id</u>.

A DHO need not accept what the inmate perceives to be the "best" or most convincing or persuasive set of facts. Rather, under <u>Hill</u>, there need only be "some evidence" to support the disciplinary decision. 472 U.S. at 455-56. This standard is satisfied where "there is any evidence in the record that could support the conclusion reached by the disciplinary board." <u>Id</u>. A disciplinary committee's

resolution of factual disputes should is not subject to review where the standard in Hill is satisfied. Id.

In this case, the DHO documented in Section V, Specific Evidence Relied on to Support Findings, namely, the written reports and memorandums of Officers Ross and Keim, and Muhammud's own verbal and written statements at the hearing. In accordance with Hill, there need only be "some evidence" to support the disciplinary decision. 472 U.S. at 455-56. In this instance, there is "some evidence" to support the decision of the DHO.

Finally, the Court finds that all sanctions imposed by the DHO were within the limits of 28 C.F.R. § 541.13. Petitioner was found guilty of a 200-level, high category prohibited act. Pursuant to 28 C.F.R. § 541.13, the following are the sanctions available for 200-level offenses:

    A.    Recommend parole date rescission or retardation.
    B.    Forfeit earned statutory good time or non-vested good conduct time up to 50%, or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).
    B.1.   Disallow ordinarily between 25% and 50% (14-27 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).
    C.    Disciplinary Transfer (recommend)
    D.    Disciplinary segregation (up to 30 days).
    E.    Make monetary restitution.
    F.    Withhold statutory good time.

G. Loss of privileges: commissary, movies, recreation, etc.
H. Change housing (quarters).

Thus, the sanctions imposed by the DHO in the present case were consistent with the severity level of the prohibited act and within the maximum available to the DHO. Accordingly, the petition will be denied.

A separate Order will be issued.

Dated: May 5, 2014

_____
**United States District Judge**